JUDGE HOLWELL

Kyle C. Bisceglie, Esq.
Mason A. Barney, Esq.
Olshan Grundman Frome Rosenzweig & Wolosky, LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10002
Telephone: (212) 451-2387
Facsimile: (212) 451-2222



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TV TOKYO CORPORATION, and NIHON
AD SYSTEMS, INC.,

                     Plaintiffs,

        -against-

4KIDS ENTERTAINMENT, INC.

                     Defendant.

Case No.

COMPLAINT

---

Plaintiffs TV TOKYO CORPORATION, and NIHON AD SYSTEMS, INC., by their

attorneys, Olshan Grundman Frome Rosenzweig & Wolosky LLP, for their Complaint, allege on

personal knowledge as to themselves and upon information and belief as to all other matters:

## THE PARTIES

1.     TV Tokyo Corporation ("TV Tokyo") is a corporation organized and existing

under the laws of Japan, with its principal place of business in Tokyo, Japan.

2.     Nihon Ad Systems, Inc. ("NAS" and collectively with TV Tokyo, "Plaintiffs" or

"Licensor") is a corporation organized and existing under the laws of Japan, with its principal

place of business in Tokyo, Japan.

3.      Defendant 4Kids Entertainment, Inc. ("4Kids") is a publicly held corporation organized and existing under the laws of the state of New York, with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Plaintiffs are corporations organized and existing under the laws of Japan, with their principal places of business in Tokyo, Japan, and defendant is a corporation organized and existing under the laws of the state of New York, with its principal place of business in New York.

5.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391, as the parties have agreed in their April 18, 2001 Yu-Gi-Oh! agreement ("2001 YGO Agreement") and their July 1, 2008 amended and restated Yu-Gi-Oh! agreement ("2008 YGO Agreement" and collectively with the 2001 YGO Agreement, the "YGO Agreements") that any suit commenced by Plaintiffs to resolve any breach of the YGO Agreements shall be submitted to the exclusive jurisdiction of the United States District Court for the Southern District of New York.   In addition, venue is proper pursuant to 28 U.S.C. § 1391 because Defendant is a resident of New York County in the state of New York.

## FACTUAL BACKGROUND

A.      **The YGO Agreements**

6.      Plaintiffs NAS, an animation studio in Japan, and TV Tokyo, a television station in Tokyo, Japan, own the rights to several series of animated television programs based on the Yu-Gi-Oh! manga, including Yu-Gi-Oh! Duel Monsters, Yu-Gi-Oh! GX and Yu-Gi-Oh! 5D (collectively "YGO").

2

7.      On April 18, 2001, Plaintiffs entered into the 2001 YGO Agreement with 4Kids. As part of this agreement, Plaintiffs granted "to 4Kids . . . the right to exploit the Television Broadcast Rights and the Home Video Rights" along with "the Merchandising Rights, certain publishing rights and promotion rights" to the YGO series as defined in the 2001 YGO Agreement (collectively the "YGO Rights"). (2001 YGO Agreement at 1).

8.      The 2001 YGO Agreement granted 4Kids the exclusive right to exercise the YGO Rights anywhere in the world except for certain Asian countries listed in the 2001 YGO Agreement (e.g., China, Hong Kong, India, Japan and Thailand).

9.      By 2008, Plaintiffs and 4Kids wished to amend and restate the 2001 YGO Agreement, inter alia, to account for new YGO series that had been released and to more specifically address new technological methods of media delivery such as the Internet. To this end, on July 1, 2008, the parties signed the 2008 YGO Agreement.[1]

B.      **The 2010 Audit**

10.     Under the YGO Agreements, Plaintiffs had "the right to audit the books and records of 4Kids insofar as they relate to the exploitation of the Rights to the Property." (2001 YGO Agreement ¶ 4(f); 2008 YGO Agreement ¶ 4(f)). In addition, 4Kids agreed that "[a]ny underpayment reflected in the audit shall be paid to Licensor promptly." (2001 YGO Agreement ¶ 4(f); 2008 YGO Agreement ¶ 4(f)).

11.     In or about February of 2010, Plaintiffs hired Anthony Curtis Elliott, CPA, to conduct an inspection and audit of the royalty payments made by 4Kids to Plaintiffs under the YGO Agreements. The audit was intended to be conducted in multiple phases, with each phase

---

[1]     Many parts of the 2001 YGO Agreement and the 2008 YGO Agreement are identical. Where the sections referred to in this complaint are identical, the two agreements will be collectively referenced as the YGO Agreements for simplicity. Otherwise, any differences between the relevant sections in the 2001 YGO Agreement and 2008 YGO Agreement will be noted.

3

looking at a different aspect of the relationship.   The initial phase was intended to inspect revenue derived from (1) the United States merchandising rights; (2) the United States home video rights; and (3) contractually allowed deductions taken out of the payments to Plaintiffs.

12.       On February 10, 2010, Mr. Elliott sent to 4Kids an initial document request for documents concerning the YGO royalties.  He followed this request with subsequent document and information requests sent between March 2010 and October 2010.  With 4Kids' permission, Mr. Elliott also visited 4Kids' offices in New York on no fewer than three separate occasions in order to gather further information and speak with 4Kids representatives.  During the audit, Mr. Elliott discovered a number of underpayments, wrongful deductions and unmet obligations by 4Kids.

13.       On June 17, 2010, Plaintiffs sent a letter to Alfred Kahn, then the Chief Executive Officer of 4Kids.[2]  In this letter Plaintiffs noted several of the issues found by Mr. Elliott up to that point.  Mr. Kahn responded to this letter on June 28, 2010, but failed to address many of the points raised in Plaintiffs' June 17th letter.

14.       On June 25, 2010, Plaintiffs' counsel wrote to 4Kids' general counsel, Samuel Newborn.  In this letter, Plaintiffs' counsel outlined several of the issues found by Mr. Elliott up to that point in his audit, and demanded repayment as per the YGO Agreements' audit clause. Plaintiffs' counsel requested a prompt response from 4Kids indicating whether they were willing to discuss these issues further.  On June 29, 2010, Mr. Newborn responded, but he stated that 4Kids disagreed with all the positions taken by Plaintiffs, or demanded yet further information.

15.       After this exchange of letters, the parties agreed to continue the audit and to discuss any audit findings made by Mr. Elliott at the conclusion of the first phase of the audit.

---

[2]       On January 11, 2011, 4Kids announced that Mr. Kahn had resigned from his positions as CEO and Chairman of 4Kids' Board of Directors.

1005413-8

16.     On November 17, 2010, Mr. Elliott issued his final confidential audit report, in which he concluded that 4Kids had repeatedly failed to comply with its obligations under the YGO Agreement.  Due to these breaches of the YGO Agreement, 4Kids now owes Plaintiffs $4,792,460.36.  On December 20, 2010, Plaintiffs sent a letter to Mr. Kahn describing Mr. Elliott's findings and demanding payment within ten business days of the date of that letter.

C.     **The Distribution of the Gross Income**

17.     YGO was a popular product for 4Kids, which produced over $152,000,000 in income between 2001 and 2009.

18.     In return for the lucrative YGO Rights, the parties agreed that Plaintiffs would receive a portion of the gross receipts received from exploitation of the YGO Rights.

19.     In paragraph 4 of the 2001 YGO Agreement, 4Kids agreed to pay Plaintiffs "fifty percent (50%) of the Gross Income . . . received by 4Kids from the exploitation or license of the Rights" less several pre-defined expenses.  (2001 YGO Agreement ¶ 4(c)).  4Kids received the other 50% of the Gross Income.  (2001 YGO Agreement ¶ 4(d)).

20.     In the 2001 YGO Agreement, the parties adopted a broad definition of what constituted "Gross Income."  They agreed that:

> "Gross Income" shall be defined as the gross receipts received from the exploitation or license of the Rights to the Property in the Territory (but not including any advertising revenues should 4Kids broadcast the Episodes in the United States on any network block controlled by 4Kids, including the Fox Network during the Saturday morning kids block ("Fox Block") [sic].

(2001 YGO Agreement ¶ 4(c)).[3]

---

[3]     In operative part, this definition remained the same in the 2008 YGO Agreement.  (2008 YGO Agreement ¶ 4(c)(iii)).  Specifically, in the 2008 agreement, the advertising revenue parenthetical was broadened slightly, and a sentence was added to the end of the definition which said that "Gross Income shall also not include advertising revenues from 4Kids Websites unless otherwise agreed by the parties pursuant to Paragraph 1 (a) (iii) above."  (2008 YGO Agreement ¶ 4(c)(iii)).  Neither of these changes have any effect on the claims brought herein.

D.   **The Home Video Rights**

21.   Among the lucrative aspects of the YGO Rights was the right to sell home videos of the YGO Series.

22.   The Home Video Rights are defined in the YGO Agreements as: "the right to manufacture, distribute and sell, or license one or more third parties to manufacture, distribute and sell episodes and any Additional Episodes of the Series by means of video cassettes, dvd, cd-rom and/or such other home video formats as may hereafter be created . . . ." (2001 YGO Agreement at ¶ 1(b)(ii).)[4] If 4Kids licensed the Home Video Rights, then the parties would include the income from the licensing as part of Gross Income.

23.   When 4Kids entered into licensing agreements for the Home Video Rights, the YGO Agreements obligated it to "use customary forms of license agreements[.]" (2001 YGO Agreement ¶ 9(c); 2008 YGO Agreement ¶ 9(c)).

24.   In total, the exploitation of these Home Video Rights resulted in $5,879,607.35 in domestic home video revenue and $2,751,900.44 in international home video revenue.

E.   **The Funimation Services Agreement**

25.   4Kids entered into a number of agreements with various third parties concerning the Home Video Rights, including Funimation Productions, Ltd. ("Funimation").

26.   On information and belief, 4Kids entered into a home video licensing agreement with Funimation on March 1, 2002. 4Kids subsequently amended and restated that agreement on July 1, 2003 (the "Funimation Distribution Agreement").

27.   Under the Funimation Distribution Agreement, 4Kids granted Funimation the broad right to exploit the Home Video Rights. Specifically, Funimation could "manufacture,

---

[4]   The 2008 YGO Agreement defines the term in substantially the same way.

sell, lease, rent, distribute, advertise, publicize, market and otherwise exploit [YGO] Home Videos." (Funimation Distribution Agreement at ¶ 1(a)).

28.     The Funimation Distribution Agreement provided that Funimation would pay 4Kids a royalty of "20% of the Gross Receipts actually received by" Funimation. (Funimation Distribution Agreement at ¶ 3(b), Sched. II.C.).

29.     In his June 28th letter, Mr. Kahn stated that 4Kids took the 20% royalty received from Funimation and included that as part of the total Gross Income, which was then split between 4Kids and Plaintiffs as per the YGO Agreements.

30.     However, 4Kids conspired with Funimation to fraudulently hide from Plaintiffs more than 45% of the total income Funimation paid to 4Kids from the sale of the home videos.

31.     On March 1, 2002 — the same day they entered into the original Funimation Distribution Agreement — 4Kids and Funimation also entered into a secret home video services agreement. Then, on July 1, 2003 — again, the same day they entered into the amended and restated Funimation Distribution Agreement — 4Kids and Funimation entered into an amended and restated home video services agreement ("Funimation Services Agreement"). Like the Funimation Distribution Agreement, the Funimation Services Agreement concerned not only the YGO series but also several other animation series not owed by Plaintiffs. Mr. Newborn signed both of the Funimation Distribution and Services Agreements on behalf of 4Kids.

32.     Under the Funimation Services Agreement, 4Kids was obligated to do very little. 4Kids agreed "at [its] own cost" to, *inter alia*, perform certain marketing services (Funimation Services Agreement at ¶ 3(a)), to produce "advertising teasers" and "inserts" to the home video packaging (Funimation Services Agreement at ¶ 4(a)) and to produce "supplemental content to

be agreed upon by 4Kids and [Funimation] to be included in the DVD Series Titles" (Funimation Services Agreement at ¶ 4(b)).

33.     In turn, Funimation was obligated to do much more.  Under the Funimation Services Agreement, Funimation had, *inter alia*, (1) to "produce and package the Series titles using the masters and Packaging design delivered by 4Kids;" (2) to "distribute Series Titles;" (3) to "handle all order processing and returns;" and (4) to "collect the money from the sale of the Series Titles and prepare accounting statements that are required pursuant to the Distribution Agreement and this Agreement."  (Funimation Services Agreement at ¶ 5(a).)  In other words, the Services Agreement obligated Funimation to manufacture, distribute and sell home videos of the YGO series.

34.     Additionally, Funimation had to pay 4Kids an advance of $1,300,000 for the privilege of its greater obligations.   (Funimation Services Agreement at ¶ 8(a)).   In the Funimation Services Agreement, Funimation agreed to kick back to 4Kids a portion of the income it received on every home video sold (the "Funimation Service Fee").  The Funimation Services Agreement set the Funimation Service Fee based on a sliding scale set forth in an exhibit to the Funimation Services Agreement. (Funimation Services Agreement at ¶ 8(b)).

35.     On information and belief, the Service Fee for the YGO series totaled $3,934,000, which, upon information and belief was the vast majority of compensation paid by Funimation under the Funimation Services Agreement.

36.     The money earned was part of the gross receipts received by 4Kids for licensing the YGO Home Video Rights and as such should have been split between 4Kids and Plaintiffs as part of the Gross Income.  However, 4Kids did not pay any royalties to Plaintiffs on any of the Service Fee income.

37.     In fact, 4Kids endeavored to keep the Service Fee income and the entire Funimation Services Agreement a secret from Plaintiffs.  To this end, the Funimation Services Agreement included a clause that required the parties to "keep the terms and conditions of this Agreement strictly confidential" and to not "disclose the terms and conditions of this Agreement to any third party." (Funimation Services Agreement at ¶ 12(b)).  The agreement went so far as to require the parties to inform people within their own companies about the agreement "on a strict 'need to know basis' and to such party's attorneys, accountants and professional advisors who need to know such information[.]" (Funimation Services Agreement at ¶ 12(b)).  Moreover, if a party disclosed the agreement to a person within its own company, "each such person shall be informed . . . of the confidential nature of the terms and conditions of this Agreement" and "in any event, the disclosing party shall be responsible for any breach of this Agreement by any such person." (Funimation Services Agreement at ¶¶ 12(b)(i)-(ii)).

38.     No comparable provision was inserted into the Funimation Distribution Agreement, executed on the same day.

39.     Additionally, 4Kids hid the royalties under the Funimation Services Agreement from Plaintiffs.  The YGO Agreements required 4Kids to give Plaintiffs a quarterly report within forty-five days after the end of each calendar quarter.  Among other things, the quarterly reports were required to "list the gross receipts actually received by 4Kids in the applicable calendar quarter from each licensee of Merchandising Rights, Television Broadcast Rights, Home Video Rights, publishing rights and Other Rights to the Property." (2001 YGO Agreement ¶ 4(e); 2008 YGO Agreement ¶ 4(e)).  4Kids provided more than thirty quarterly reports to 4Kids and none of them reported any income from the Funimation Services Agreement due to Plaintiffs.

9

40.     It was only because Plaintiffs' auditor noticed an oblique reference to "Service Fees" in three of 4Kids' more than thirty quarterly reports to Plaintiffs that Plaintiffs were even led to inquire about a "services agreement."  Indeed, 4Kids did not mention the existence of the Funimation Services Agreement to Plaintiffs until Plaintiffs' auditor demanded a copy of the Funimation Services Agreement.  These attempts to cover up its secret Funimation Services Agreement ran counter to 4Kids' obligations under the YGO Agreements.

F.     **The Majesco Services Agreement**

41.     The Funimation Services Agreement is not the only instance in which 4Kids entered into a secret side agreement in order to avoid paying Plaintiffs.  On April 1, 2004, 4Kids entered into an agreement with Majesco Sales Inc. ("Majesco") to produce and distribute videos of the YGO episodes on Nintendo's Gameboy Advanced ("GBA Videos") gaming system (the "Majesco Distribution Agreement").

42.     Under the Majesco Distribution Agreement, Majesco agreed to pay 4Kids a royalty of $2 per GBA Video sold, and $366,667 as an advance on this revenue.  (Majesco Distribution Agreement at Schedules II.A-C).  The Majesco Distribution Agreement did not generate any royalties beyond the $366,667 advance.  4Kids passed on one-half of this advance payment to Plaintiffs as part of the Gross Income distribution.

43.     However, just as they did with Funimation, 4Kids conspired with Majesco to hide from Plaintiffs one-third of the Gross Income paid to 4Kids by Majesco for the YGO rights.  On the same day they entered into the Majesco Distribution Agreement, 4Kids and Majesco also entered into a services agreement concerning the GBA Videos (the "Majesco Services Agreement").  As with Funimation, under the Majesco Services Agreement, 4Kids agreed to provide "marketing support for the GBA Videos" and Majesco agreed to pay 4Kids an additional

$1 from each GBA Video sold, with $183,333 of this to be paid to 4Kids in advance. (Majesco Services Agreement at ¶ 6(a)). Mr. Newborn signed both of the Majesco Distribution and Services Agreements on behalf of 4Kids.

44.   Also as with the Funimation deal, 4Kids and Majesco agreed to keep the payments and the entire Majesco Services Agreement a secret. The Majesco Services Agreement included the same secrecy clause as the Funimation Services Agreement. Again, it required the parties to "keep the terms and conditions of this Agreement strictly confidential" and to not "disclose the terms and conditions of this Agreement to any third party." (Majesco Services Agreement at ¶ 10(a)). The Majesco Services Agreement also requires the parties to inform only people within their own companies about the agreement "on a strict 'need to know basis' and to such party's attorneys, accountants and professional advisors who need to know such information[.]" (Majesco Services Agreement at ¶ 10(a)). Moreover, if a party discloses the agreement to a person within its own company, "each such person shall be informed . . . of the confidential nature of the terms and conditions of this Agreement" and "in any event, the disclosing party shall be responsible for any breach of this Agreement by any such person." (Majesco Services Agreement at ¶ 10(a)(i)-(ii)).

45.   4Kids never paid Plaintiffs their one-half of the Gross Income generated by the Majesco Services Agreement.

46.   On information and belief, 4Kids entered into other service agreements with other companies, both within the United States and outside the United States, relating to 4Kids' exploitation of the YGO Rights and did not pay Plaintiffs their portion of the revenue generated by those services agreements.

11

G.     **Deductions From Plaintiffs' Portion of the Gross Income**

47.     The YGO Agreements allowed 4Kids to deduct only a limited set of expenses

from the share of the Gross Income paid to Plaintiffs.  These expenses were:

> the Actual Third Party out-of-pocket expenses incurred by 4Kids
> for copyright and trademark registrations for the property in the
> Territory . . ., insurance expenses pursuant to Paragraph 13 . . .
> (with Licensor's share of the 4Kids Errors and Omissions
> Insurance premiums computed on pro-rata basis with other
> television series and movies insured under such insurance policy
> but in no event shall the cost to Licensor exceed $15,000 per year)
> and withholding taxes required by law to be deducted as provided
> in Paragraph 4(g)[.]

(2001 YGO Agreement ¶ 4(c); 2008 YGO Agreement ¶ 4(c)(i)).

48.     All other expenses incurred from the exploitation or licensing of the YGO Rights

were to be paid "from 4Kids' share of the Gross Income."  (2001 YGO Agreement ¶ 4(d)(iii);

2008 YGO Agreement ¶ 4(d)(iii)).  These included:

> all expenses with respect to the adaptation, dubbing, and rescoring
> of the Series, the advertising and marketing of the Series and the
> exploitation of the Television Broadcast Rights, Home Video
> Rights, Merchandising Rights, publishing rights and promotion
> rights to the Series.   4Kids shall also pay all subagents
> commissions from 4Kids' share of the Gross Income from the
> exploitation or license of the Rights to the Property.

(2001 YGO Agreement ¶ 4(d)(iii); 2008 YGO Agreement ¶ 4(d)(iii)).

H.     **Unsubstantiated International Withholding Taxes**

49.     Concerning 4Kids' right to deduct withholding taxes from Plaintiffs' share of the

Gross Income, the YGO Agreements state that if 4Kids deducted the taxes:

> 4Kids shall provide Licensor or shall cause the applicable subagent
> or applicable licensee to provide Licensor with evidence of
> payment of such withholding tax on behalf of Licensor so that
> Licensor may claim an appropriate tax credit or tax deduction.
> 4Kids shall also assist Licensor in filing any and all forms with the
> taxation authorities of the various countries within the Territory so

> as to enable Licensor to claim any tax credits to which Licensor
> may be entitled.

(2001 YGO Agreement at ¶ 4(g); 2008 YGO Agreement at ¶ 4(g).)

50.     Between 2001 and 2009, 4Kids deducted $2,538,963.75 from Plaintiffs' share of the Gross Income to account for the foreign withholding taxes supposedly paid by international licensees on the YGO-related income.

51.     Starting in 2004, Plaintiffs regularly inquired with 4Kids about when Plaintiffs could expect to receive evidence of payment of the foreign taxes that 4Kids was deducting from its payments to Plaintiffs. 4Kids told Plaintiffs that the international licensees would provide the evidence of payment directly to Plaintiffs in the form of tax withholding certificates. 4Kids told Plaintiffs that it would push these licensees, with whom Plaintiffs did not otherwise necessarily have direct contact, to provide such evidence on a timely basis.

52.     Despite 4Kids' promise to push the international licensees, Plaintiffs received no evidence of payment of the foreign withholding taxes. Nonetheless, during the 2010 audit, Plaintiff's auditor discovered that 4Kids did collect such evidence from its international licensees in the form of tax withholding certificates. However, 4Kids has either misplaced or never even collected tax certificates for over half the amounts it deducted from Plaintiffs' share of the Gross Income. Out of the $2,538,963.75 in foreign withholding taxes deducted from Plaintiffs' share of the Gross Income, during the audit, 4Kids was unable to provide any evidence to substantiate $1,386,913.86 worth of the deductions.

53.     Moreover, out of the tax certificates that 4Kids did turn over during the audit, $878,853.30 worth of the certificates incorrectly named 4Kids, not Plaintiffs, as the beneficiary. By naming 4Kids as the beneficiary, Plaintiffs are unable to claim the benefit of the certificates on their Japanese taxes.

13

1005413-8

54.     Thus, because of 4Kids' failure to properly collect and/or remit evidence of payment of the foreign withholding taxes it deducted, Plaintiffs are unable to qualify for $2,265,767.16 worth of tax credits.

I.      **Improper Deduction of Audit Fees**

55.     Between the Second Quarter of 2005 and the Second Quarter of 2009, 4Kids conducted a number of royalty audits of its licensees and deducted $105,111.20 from Plaintiffs' share of the Gross Income to pay for these audits.

56.     The YGO Agreements do not authorize 4Kids to deduct audit expenses from Plaintiffs' share of the Gross Income.   To the contrary, the audit provisions in the YGO Agreements state that Plaintiffs need only pay for those audits that they initiate, and even then only if the underpayment found is less than 5% of the total amount due to Plaintiffs.  (2001 YGO Agreement at ¶ 4(f); 2008 YGO Agreement at ¶ 4(f)).   Therefore, 4Kids should not have deducted the audit expenses from Plaintiffs' share of the Gross Income.

J.      **Improper Deduction of Bank Charges**

57.     Between 2004 and 2009, 4Kids deducted from Plaintiffs' share of the Gross Income $4,270.58 for unspecified "bank charges."  These deductions were not authorized by the YGO Agreements and were therefore improperly deducted from Plaintiffs' share of the Gross Income.

K.      **Improper Deduction of the YGO Style Guide Art**

58.     In the first quarter of 2004, 4Kids deducted from Plaintiffs' share of the Gross Income $80,201.79 worth of expenses to cover the "YGO Style Guide Art."  These expenses were not among those specifically allowed to be deducted from Plaintiff's share of the Gross

Income by the YGO Agreements.  Nevertheless, when 4Kids approached Plaintiffs about these expenses, Plaintiffs agreed that these expenses should be "top off" costs, meaning they should be divided evenly between Plaintiffs and 4Kids.

59.     However, 4Kids did not divide the $80,201.79 expense between itself and Plaintiffs.  Rather it deducted the full cost from Plaintiffs' share of the Gross Income.

**L.     Improper Deduction of the YGO GX-Ares Dubbing Fee**

60.     In the fourth quarter of 2009, 4Kids approached Plaintiffs about deducting from Plaintiffs' share of the Gross Income the cost to dub the YGO GX-Ares episodes.  Plaintiffs rejected 4Kids' request to cover this cost because it is a cost 4Kids expressly agreed to bear under the YGO Agreements.  Specifically, the 2008 YGO Agreement states that "4Kids shall pay from 4Kids' share of the Gross Income from the exploitation or license of the Rights to the Property all expenses with respect to the adaptation, *dubbing*, and rescoring of the Series[.]" (2008 YGO Agreement at ¶ 4(d)(iii) (emphasis added).)

61.     Yet despite its agreement to pay all dubbing costs and Plaintiffs' statements that it would not split the costs with 4Kids, 4Kids proceeded to improperly deduct $3,443.69 from Plaintiffs' share of the Gross Income to cover the cost of the YGO GX-Ares dubbing.

**M.     Unauthorized Insurance Deductions**

62.     The YGO Agreements obligate 4Kids to obtain insurance coverage on behalf of Plaintiffs.  Paragraph 13 of the YGO Agreements states that 4Kids must:

> obtain and maintain on behalf of Licensor and 4Kids at Licensor's expense Errors and Omissions Insurance . . . covering all Episodes with limits of at least One Million Dollars (U.S. $1,000,000) for each claim as well as General Liability Insurance with limits of at least One Million Dollars shall be with a company which has a Best rating of A plus or better.   A copy of the insurance certificate(s) shall be furnished to Licensor and shall contain a

provision requiring Licensor to be furnished with a thirty (30) day notice of cancellation.

(2001 YGO Agreement ¶ 13; 2008 YGO Agreement ¶ 13).

63.     To cover the cost of this insurance, paragraph 4(c) of the YGO Agreements states that 4Kids could deduct certain insurance expenses from Plaintiffs' share of the Gross Income, "with [Plaintiffs'] share of the 4Kids Errors and Omissions Insurance premiums computed on pro-rata basis with other television series and movies insured under such insurance policy but in no event shall the cost to Licensor exceed $15,000 per year."

64.     Each year between 2001 and 2009, 4Kids deducted from Plaintiffs' share of the Gross Income the maximum $15,000 allowed under the Agreements, for a total of $135,000 over the nine years.   4Kids justified this by calculating Plaintiffs' share of the insurance as the percentage of 4Kids' total company revenue generated by YGO.   This resulted in Plaintiffs being allotted between 16% and 40% of the total insurance cost, depending on the year.   Because this amount was greater than $15,000 in each of the nine years, 4Kids charged Plaintiffs the maximum $15,000 allowed by the Agreements.

65.     Nonetheless, on the same insurance policy as the YGO properties, 4Kids paid to have 130 additional properties/entities insured.   Of these 130, only seven of the properties related to YGO, which means only 5.38462% of the additional insured properties concerned Plaintiffs. As a result, Plaintiffs' pro-rata share of the insurance cost should have been only 5.38462% of the total insurance cost each year.   Calculated at that percentage, the deduction from Plaintiffs' share of the Gross Income for the entire nine-year period should have been only $67,671.55 — $67,328.45 less than 4Kids actually deducted.

66.     In addition, despite the language in the YGO Agreements, Plaintiffs were not among the 130 entities listed as additional insured by 4Kids.

16

N.     **The Cost of Providing the Materials**

67.     Beyond failing to disclose money it earned, 4Kids also failed to reimburse Plaintiffs for costs 4Kids is required to cover.

68.     Plaintiffs provide to 4Kids a Digital Beta NTSC master tape of each episode, along with music effects, a script and music cues (the "Materials"). The YGO Agreements obligate 4Kids to pay for the cost of the Materials. (YGO Licensing Agreements at ¶ 5(a)). On October 15, 2010 Plaintiffs sent 4Kids an assessment of the material and courier costs incurred through September 2010. These costs totaled $247,771.88. Plaintiffs understood that 4Kids, in satisfaction of its obligations under the YGO Agreements, would pay this full amount by November 30, 2010, however, that did not happen and no payments have been received to date.

O.     **2010 Audit Fee**

69.     The YGO Agreements also provide that "if any audit reveals an underpayment by 4Kids of more than five (5%) percent of the amount due Licensor, . . . 4Kids shall reimburse Licensor for the reasonable cost of such audit." (2001 YGO Agreement ¶ 4(f); 2008 YGO Agreement ¶ 4(f)). In its June 25, 2010 letter, the undersigned counsel noted that Plaintiffs' audit had found a greater than 5% underpayment, and requested that 4Kids cover the full cost of Plaintiffs' audit. In his June 29, 2010 response, Mr. Newborn stated that if an underpayment of more than 5% is found, 4Kids would reimburse Plaintiffs for the cost of the audit. Mr. Elliott found that during the relevant audited period, 4Kids had paid to Plaintiffs $68,844,489.48 under the YGO Agreements. 4Kids underpaid Plaintiffs by $4,792,460.36, which represents approximately a 7% underpayment.

P.   **Other Outstanding Amounts Owed**

70.   Beyond the amounts found by Mr. Elliott in his audit, 4Kids also has not paid Plaintiffs on several other outstanding amounts it owes.

71.   In paragraph 4(b)(ii) of the 2008 YGO Agreement, 4Kids agreed to pay Plaintiffs a $1,000,000 advance on royalties.  It agreed to pay one-half of this advance, $500,000, on July 1, 2009.  4Kids did not make this payment, and thus, on information and belief, 4Kids still owes Plaintiffs $500,000.

72.   Under paragraph 4(e) of the 2008 YGO Agreement, "[w]ithin forty-five (45) days after the end of each calendar quarter[,]" 4Kids is obligated to provide to Plaintiffs a quarterly report "setting forth the Gross Income received by 4Kids during the applicable calendar quarter from the exploitation or license of the Rights to the Property."  In addition, the quarterly report "shall be accompanied by a check for any amount due" to Plaintiffs.  (2008 YGO Agreement ¶ 4(e)).  The fourth quarter of 2010 ended on December 31, 2010; thus 4Kids should have delivered its quarterly report and quarterly royalties check to Plaintiffs on February 14, 2011.  As of the filing of this complaint, Plaintiffs have received neither the report nor a check from 4Kids concerning the fourth quarter of 2010.

73.   In a letter agreement between Plaintiff NAS, The Cartoon Network, Inc. (the "Cartoon Network"), and 4Kids, dated on or around August 18, 2009, (the "2009 Cartoon Network Agreement") NAS agreed to purchase $500,000 worth of advertising time on the Cartoon Network.  Under this agreement, 4Kids agreed "to purchase $83,333 net of advertising time," which should have been deducted from the $500,000 purchase made by NAS.  On information and belief, 4Kids has failed to make this purchase and thus owes $83,333 to NAS.

74.   On information and belief, in or around January 2009, 4Kids entered into an agreement   with   a   toy   manufacturing   company,   Playmates   Toys   Inc.   ("Playmates"),   to

18

manufacture toys based on the YGO series.   Playmates did not perform well under that agreement and asked 4Kids if it could terminate the agreement.   In or around January 2011, 4Kids agreed to allow Playmates to terminate the agreement in return for a payment of $200,000, of which, Plaintiffs should have received half that amount.   Thus, 4Kids owes, but has not yet paid, Plaintiffs $100,000.

Q.    **Termination of the 2008 YGO Agreement**

75.    The 2008 YGO Agreement provides that if either party breaches the Agreement, the non-breaching party may terminate the Agreement after giving notice of the breaches and opportunity to cure the breaches.   Specifically, paragraph 12(a) states:

> If either party breaches any warranty or other material provision of this Yu-Gi-Oh! Agreement and does not cure such breach within ten (10) business days of the breaching party's receipt of a written notice of such breach from the non-breaching party, then at any time during the continuance of such default, the non-breaching party may, in addition to any other rights the non-breaching party may have at law or in equity, terminate this Agreement effective as of the date of the breaching party's receipt of a written notice from the non-breaching party notifying the breaching party of such termination.

(2008 YGO Agreement ¶ 12(a)).

76.    Following the December 20, 2010 letter notifying 4Kids that Mr. Elliott had found that 4Kids had not fulfilled its duties under the YGO Agreements, Plaintiffs' representatives met with 4Kids' representatives on February 2, 2011 for the purpose of obtaining a cure of 4Kids' breaches of the YGO agreements.   This meeting was unsuccessful.

77.    In a letter dated March 4, 2011, Plaintiffs' counsel again requested a cure from 4Kids for its breaches and, potentially, an opportunity to continue as a licensee of YGO.   4Kids chose to not accept this offer to cure.

78.     On March 17, 2011, after further discussions between Plaintiffs and 4Kids, 4Kids wired to Plaintiffs' bank account $1,000,000 as an initial payment in "good faith" on money owed Plaintiffs.

79.     On March 18, 2011, several representatives of Plaintiffs flew in from Japan for the sole purpose of meeting with 4Kids' representatives again to seek a way for 4Kids to fully cure its breaches of the YGO Agreements.   4Kids abruptly terminated this meeting without a resolution to any of the outstanding issues.

80.     4Kids did not make any specific offers to cure after walking out on March 18, 2011.

81.     As of March 24, 2011, 4Kids has still not paid any of the remaining money it owes to Plaintiffs.

82.     Plaintiffs have engaged with 4Kids for more than nine months in attempts to cure the issues raised by 4Kids' breaches of the YGO Agreements and address Plaintiffs' concerns regarding 4Kids' fraudulent behavior.   After this long dialog, Plaintiffs have concluded that 4Kids is unwilling to adequately cure its breaches of the YGO Agreements.  Moreover, Plaintiffs contend that 4Kids' breach of Plaintiffs trust can never be cured.

83.     To this end, contemporaneous with the filing of this complaint, Plaintiffs orally and by letter, informed 4Kids that effective upon the letter's receipt Plaintiffs were terminating the 2008 YGO Agreement.

## FIRST CLAIM FOR RELIEF
(Breach of the YGO Agreements)

84.     Plaintiffs repeat the allegations in paragraphs 1 to 83 above as though fully set forth herein.

85.     Plaintiffs and 4Kids entered into the 2001 YGO Agreement and the 2008 YGO Agreement.

86.     Plaintiffs performed all the duties required of them under the YGO Agreements.

87.     By taking the above described actions, 4Kids breached the YGO Agreements.

88.     Due to 4Kids' breaches, Plaintiffs were damaged by 4Kids in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
(Breach of the YGO Agreements — Covenant of Good Faith and Fair Dealing)

89.     Plaintiffs repeat the allegations in paragraphs 1 to 83 above as though fully set forth herein.

90.     Under the 2001 YGO Agreement and the 2008 YGO Agreement, there is an implied covenant of good faith and fair dealing between Plaintiffs and 4Kids.

91.     Plaintiffs performed all the duties required of them under the YGO Agreements.

92.     By taking the above described actions in bad faith and with the intent to harm Plaintiffs, 4Kids breached the implied covenant of good faith and fair dealing.

93.     Due to 4Kids' breach of the implied covenant of good faith and fair dealing, Plaintiffs were damaged by 4Kids in an amount to be determined at trial.

1005413-8

## THIRD CLAIM FOR RELIEF
### (Breach of the 2009 Cartoon Network Agreement)

94.     Plaintiffs repeat the allegations in paragraphs 1 to 83 above as though fully set forth herein.

95.     NAS, Cartoon Network and 4Kids entered into the 2009 Cartoon Network Agreement.

96.     NAS performed all the duties required of it under the 2009 Cartoon Network Agreement.

97.     By taking the above described actions, 4Kids breached the 2009 Cartoon Network Agreement.

98.     Due to 4Kids' breaches, NAS was damaged by 4Kids in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Fraud)

99.     Plaintiffs repeat the allegations in paragraphs 1 to 83 above as though fully set forth herein.

100.     4Kids knowingly entered into a scheme with the intent to fraudulently induce Plaintiffs to enter into the 2008 YGO Agreement while at the same time understating Plaintiffs' share of the Gross Income.

101.     In order to accomplish this, 4Kids negotiated side services agreements with Funimation and Majesco, and perhaps others, that ensured large payments to 4Kids. Nonetheless, 4Kids did not want Plaintiffs to know about these lucrative side services agreements; to ensure this, 4Kids had inserted into each side services agreement a secrecy clause that prohibited the parties from revealing the existence of the side services agreements.

1005413-8

102.     4Kids then prepared numerous reports to Plaintiffs that excluded any income due to Plaintiffs generated by the side services agreements.

103.     4Kids also informed Plaintiffs that, even thought it was deducting money from its payments to Plaintiffs to cover the foreign taxes that its international licensees had withheld, it was not collecting the accompanying tax certificates, which 4Kids told Plaintiffs would be sent directly by the international licensees to Plaintiffs. Nevertheless, 4Kids was collecting these tax certificates without telling Plaintiffs.

104.     Plaintiffs relied on these and other statements and reports by 4Kids when negotiating and agreeing to enter into the 2008 YGO Agreement.

105.     As a direct result of 4Kids' fraudulent concealment of the side services agreements and their statements concerning the tax withholding certificates, Plaintiffs were fraudulently induced into entering into the 2008 YGO Agreement and were damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
(Demand for Accounting)

106.     Plaintiffs repeat the allegations in paragraphs 1 to 83 above as though fully set forth herein.

107.     Pursuant to the YGO Agreements, Plaintiffs are entitled to an accounting of all moneys earned by 4Kids relating to the exploitation of the YGO Rights, either within or outside the United States.   This accounting should include, but is not limited to, subagent fees, international merchandising sales, domestic and international broadcasting agreements, international home video sales and music sales.  Plaintiffs have attempted to perform an adequate accounting, but were wrongfully inhibited from doing so by 4Kids' refusal to cooperate with Plaintiffs' auditor.

1005413-8

108.     Plaintiffs, therefore, request an accounting of all moneys earned by 4Kids relating to the exploitation of the YGO Rights.

### SIXTH CLAIM FOR RELIEF
(Attorney's Fees and Litigation Costs)

109.     Plaintiffs repeat the allegations in paragraphs 1 to 83 above as though fully set forth herein.

110.     The 2008 YGO Agreement states that "[i]n the event either party hereto brings any legal action to enforce its rights hereunder, the prevailing party in such litigation shall be entitled to its attorney's fees an [sic] costs for litigation." (2008 YGO Agreement at ¶ 15(g)).

111.     In the event that Plaintiffs prevail in this litigation, Plaintiffs are entitled to, and intend to seek, their attorney's fees and costs.

WHEREFORE, plaintiffs pray that judgment be entered against Defendant as follows:

i.      Awarding Plaintiffs their monetary damages as to be determined at trial, but not less than $4,159,126.36;

ii.     Ordering that an accounting be done of 4Kids' books and records, the cost of which is to be borne by 4Kids;

iii.    Ordering 4Kids to provide Plaintiffs with evidence of all withholding taxes deducted from Plaintiffs' share of the Gross Income sufficient to allow Plaintiffs to claim any applicable tax credits or deductions, or awarding Plaintiffs monetary compensation for any tax credits or deductions that Plaintiffs are unable to claim because 4Kids is unable to acquire the proper evidence of payment of the withholding taxes.

iv.     Awarding Plaintiffs their reasonable attorneys' fees incurred in this action, together with the costs and disbursements of this action; and

1005413-8

v.    Granting such other and further relief as the Court deems just and proper.

Dated: March, 24, 2011

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By: _____

Kyle C. Bisceglie (KB6052)
Mason A. Barney (MB7225)
*Attorneys for Plaintiffs TV Tokyo*
*Corporation and Nihon Ad Systems, Inc.*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

25

1005413-8